**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Jose Doe, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:14-cv-119 |
| Jason T. Olson, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

This action arises out of an investigation into the transfer of illicit images of children from an Internet Protocol ("IP") address assigned to a Minot, North Dakota, residence in which plaintiff was subletting a basement bedroom. During the course of the investigation law enforcement officers obtained a search warrant for the entire residence and conducted a search which included the basement bedroom that plaintiff was subletting. After conducting the search, law enforcement officers went to plaintiff's place of business where they spotted a bag in plaintiff's vehicle containing a laptop. After plaintiff denied a request to search the laptop, officers secured the vehicle until a search warrant could be obtained. The later search of the laptop pursuant to a state-court warrant revealed no illicit images of children.

# I.   BACKGROUND

## A.   Procedural background

Plaintiff initiated this action in September 2014 under the pseudonym "Jose Doe." He alleges in his complaint that the searches of his rented bedroom and vehicle were unlawful, that his rights under the Privacy Act were violated, and that he was ostensibly defamed by law enforcement. Plaintiff claims he lost both his job and his room on account of what took place and that personal

property was damaged during the searches. (Doc. No. 9).

At the time of submitting his complaint for filing, plaintiff sought approval to proceed *in forma pauperis*. (Doc. No. 1). The court granted the request (Doc. No. 8) and conducted a screening of the complaint pursuant to 28 U.S.C. § 1915(e)(2). As a result of the screening, the court did not permit plaintiff to proceed against Minot Police Chief Jason Olson because there were no allegations of his personal involvement or grounds for imposition of supervisory liability under 42 U.S.C. § 1983. The court also did not permit the suit to proceed against the North Dakota Bureau of Criminal Investigation ("BCI") and Special Agent Jesse Smith in his official capacity as an officer of the BCI because of Eleventh Amendment immunity. The court did permit plaintiff to proceed against City of Minot police officers Sgt. Dave Goodman and Det. Krista Thompson, in both their individual and official capacities, and SA Smith in his individual capacity. (Doc. Nos. 10 & 53).

Plaintiff took an interlocutory appeal to the Eighth Circuit Court of Appeals seeking review of the court's screening decision as well the court's denial of plaintiff's motion to appoint counsel. The Eighth Circuit summarily affirmed the court's order denying the motion for appointment of counsel and dismissed the remainder of the appeal for lack of jurisdiction. (Doc. No. 68).

Now pending before the court are:

1.      a "Motion to Dismiss or, in the Alternative, a Motion for Summary Judgment" filed by defendants Sgt. Goodman and Det. Thompson (herein collectively the "Minot defendants") seeking dismissal on the merits as well as that plaintiff should not be permitted to proceed under a pseudonym and qualified immunity (Doc. No. 31);

2.      a "Motion to Dismiss for Failure to State a Claim" on the grounds plaintiff should

not be permitted to proceed under a pseudonym by SA Smith  (Doc. No. 36);

3.    a "Motion for Judgment on the Pleadings" filed by SA Smith (Doc. No. 43) in which

SA Smith joins in the Minot Defendant's motion to dismiss as to the merits; and

4.    a "Motion for Leave to Proceed with a Pseudonym" filed by plaintiff (Doc. No. 49)

in response to the motions or parts of the motions seeking dismissal on the grounds

that plaintiff should not be permitted to proceed under a pseudonym.

Judge Hovland has referred the motions to the undersigned for preliminary consideration.

B.    **The alleged "defamatory" investigation**

1.    **Events leading up to the search of the residence**

The following account of the underlying investigation is taken from the affidavits and investigative reports filed by defendants in support of their respective motions.  Plaintiff has "concede[ed] he 'cannot express facts or issues that might or will contradict the facts alleged by the Defendants' or the record or from the complaint.'" (Doc. No. 63).

SA Smith was assigned to the BCI's Internet Crimes Against Children Task Force as a computer forensics examiner.  He was tasked with investigating the transfer of child pornography over the Internet via Peer to Peer ("P2P") networking technology and software.  On May 2, 2014, he notified defendant Sgt. Goodman of the Minot PD that, on March 30, 2014, he had downloaded illicit images of minor females from a computer with IP address assigned to a single family residence located at 212 18th Ave NW, Minot, North Dakota.  He also prepared and signed an application for a search warrant, which Sgt. Goodman presented to a state district court judge for consideration.  (Doc. Nos. 33-1 through 33-4, 33-7, 64).

Attached to the search warrant application was a supporting affidavit (singled-spaced and thirteen pages in length) in which SA Smith explained how P2P file sharing works - specifically the

operation of a BitTorrent network, how files that are transmitted through such a network can be tracked, why he had initiated his investigation of the subject IP address, when he was connected with and what he had downloaded from the computer with the subject IP address, and how he had located the residence to which the subject IP address was assigned. According to SA Smith's affidavit, he identified a computer with the subject IP address as a potential source of at least one file of investigative interest. From this computer he downloaded a total of 160 files, many of which contained images in which females estimated to be between the ages of 8 and 14 years of age were posing in various states of undress and exposing their breasts, vaginas, and anuses. Searching the American Registry of Internet Numbers, he learned that the computer's IP address belonged to Midcontinent Communications ("Midco"), a regional cable and internet service provider headquartered in Sioux Falls, South Dakota. He passed this information on to Homeland Security Investigations SA Darick Trudell, who was able to ascertain from basic subscriber information subpoenaed from Midco that the subject IP address had been assigned to Jose Garcia[1] at 212 18th St. NW, Minot, North Dakota (hereinafter referred to as "the residence"). (Doc. Nos. 33-2, 64).

On May 5, 2014, a state district court judge approved SA Smith's search warrant application and issued a warrant authorizing law enforcement to search the residence and seize: computers and related peripherals, CD-ROMS, DVDs, digital media devices, and other storage mediums for inspection and forensic analysis; pornographic images and/or videos of children as well as files containing any such material in any form wherever they may be stored; information, documentation, and correspondence pertaining to the electronic receipt and/or transmission of child pornography; records regarding the ownership of digital media devices and removable storage; and evidence of

---

[1] As will become clear later, Jose Garcia is not plaintiff "Jose Doe."

any P2P networking software that would allow another to remotely control the computer on which it was installed.  (Doc. No. 33-3).

### 2.    Search of the residence including plaintiff's bedroom

SA Smith, Border Patrol Agent Shawn Keller, Sgt. Goodman, Det. Thompson, three other Minot Police Department Detectives (Greg Johnson, Jessica Mosman, and Jay Laudenshlager), and two Minot patrol officers (Jay Haaland and Aaron Moss) arrived at the residence on May 6, 2014, at 9:30 a.m. to execute the search warrant.  They knocked and announced their presence.  When no one responded, they entered the residence through an unlocked door.  Inside, they encountered two adult females, Amanda and Dominique Garcia, with an infant on the main floor and three adult males in the basement.  Two additional adults, one male and one female, Marybelle Garcia, arrived at the residence shortly thereafter.   (Doc. Nos. 33-1, 33-7, 33-8, 33-9, 34, 35, 64 through 66).

Once the residence was secured, Sgt. Goodman and Det. Thompson began interviewing the persons present while the other Minot detectives began the search with assistance from SA Smith. On the main floor they found two laptop computers that presumably belonged to Amanda and Dominique Garcia.[2]  In the garage, they found a broken hard drive. In one of the rooms in the basement, they found an iPad mini along with a locked suitcase and a locked duffle bag.   To gain access to the contents of the suitcase and duffle bag, SA Smith broke their respective zippers.  Inside the suitcase Smith found a computer hard drive, two zip drives, and assorted CDs and DVDs.  Inside the duffle bag Smith found a locked safe, which he proceeded to open with a screw driver.  Inside the safe Smith found additional electronic media storage devices.   All of these items were forensically previewed on-site by Smith.  None of them contained any child pornography.  (Doc.

---

[2]    When interviewed by Goodman and Thompson, Amanda and Dominique Garcia each advised that they owned a laptop computer.  (Doc. No. 33-8).

Nos. 33-1, 33-8, 33-9, 66).[3]

Meanwhile, as Smith and company were conducting their search of the residence, Goodman and Thompson interviewed the seven adults encountered at the residence. During these interviews they were told that First Minot Management leased the residence to Jose and Marybelle Garcia, who in turn sublet their two basement bedrooms and garage (which had apparently been converted into two additional bedrooms); that the residence had as many as eleven occupants (the Garcia family and their subtenants) at any given time, and that Midco provided Internet service to the residence that all of its occupants could access wirelessly.[4] They were also told that the Garcias had received a letter from Midco warning of an illegal download of inappropriate material by one of their former subtenants.[5] With respect to plaintiff, they were told that he (1) had been subletting a room in the basement of the residence since about the end March 2014, (2) was working as a certified nursing assistant at a local nursing home, (3) drove a blue Hyundai with North Carolina plates, (4) owned a laptop computer that he carried with him in a blue bag, and (5) frequently used his laptop computer

---

[3] According to Smith, he discovered backup files from an Apple Macintosh computer on one of the items associated with plaintiff. (Doc. No. 33-1). No such computer was found at the residence, however. (Id.)

[4] According to Thompson's investigative report, a male subtenant interviewed at the scene advised that: (1) he had wirelessly logged onto the Internet with his Apple iPad at the residence; and (2) he had obtained the Wi-Fi password enabling him to do so from other occupants of the residence. A second male subtenant confirmed that the residence had "WiFi Internet that was password protected." Both of these subtenants were ruled out as suspects as it was determined they both had moved into the residence well after Smith had downloaded the illicit images. (Doc. No. 33-8).

[5] According to Thompson's investigative report, Marybelle Garcia mentioned that:

prior to moving in approximately one year ago, the internet service was in [her brother's name] but now it is in her husband's name, Jose Garcia. Marybelle mentioned that when they switched the internet bill over they received a letter from [Midco] in regards to an illegal download of inappropriate material. Jose Garcia spoke with the tenants of his home and "Brian" stated that he was the one responsible for the illegal download but they were not aware of what he had downloaded. "Brian" moved out a short time after. Garcia stated that [Jose Doe] moved in around the end of March, beginning of April.

(Doc. No. 33-8).

at the residence. (Doc. Nos. 33-1, 33-7, 33-8, 34-35, 64-65).

The bedroom that plaintiff was renting was the one that contained the locked suitcase and duffel bag that were searched by SA Smith. Although it does not make a difference in terms of the outcome here, Smith states that room was unlocked when he conducted his search and it appeared that plaintiff was sharing the room with another individual based on there being a sheet hanging in the middle dividing the room in half. (Doc. Nos. 33-1, 33-9, 33-10 & 33-11).[6]

### 3. Contact with plaintiff at his place of work and subsequent search of the computer in his vehicle

Plaintiff was not at the residence when law enforcement arrived to search it; Sgt. Goodman and Det. Thompson were told that he was at work. Consequently, upon wrapping up their work at the residence, SA Smith, Goodman, and Thompson drove to the nursing home to speak with him. (Doc. Nos. 33-7, 33-8).

In the nursing home's parking lot, SA Smith observed plaintiff's vehicle, a blue Hyundai with North Carolina plates. Approaching the vehicle and looking through its windows, Smith saw a blue bag lying on the front seat with a laptop computer visible through the opening of the bag. Proceeding inside the nursing home, the officers located plaintiff with help from the staff. Meeting privately with plaintiff in a conference room, they advised him of their investigation, gave a _Miranda_ warning, and asked for permission to search his vehicle. When plaintiff refused to consent, they advised plaintiff that they would seek a warrant to search his vehicle and laptop and that he could not remove his vehicle from the parking lot while the warrant was being obtained. Plaintiff was not

---

[6] While the record is not entirely clear, it appears plaintiff's bedroom was the one in the southwest corner of the basement. (Doc. No. 33-9). One of the Minot police officers stated this bedroom was locked when he first entered the basement but ,when more officers arrived, the door was opened by a male occupant of the residence who stepped out of the room in response to demands by the officers. (Doc. No. 33-11). Smith states that the bedroom was open by the time he conducted his search. (Doc. No. 66).

told, however, that he could not leave the premises. While Smith, Goodman, and Thompson were away seeking the warrant, a uniformed patrolman in a squad car stood by in the parking lot securing plaintiff's vehicle. (Doc. Nos 33-1, 33-7, 33-8, 34, 5, 64 through 66).

Smith prepared and Goodman presented a search warrant application for plaintiff's vehicle. In his supporting affidavit (single spaced and fourteen pages in length), Smith supplemented information he had previously provided to the state district court judge with additional information obtained during his search of the residence and Goodman's and Thompson's interviews of those present at the scene. (Doc. No. 33-4).

The state district court judge approved the search warrant application and issued a search warrant for plaintiff's vehicle and for computers, electronic devices, media, etc located in the vehicle for the presence of child pornography. (Doc. No. 33-5). Goodman, Thompson, and Smith thereafter returned to the nursing home with the search warrant in hand. When executing the warrant, Smith forensically previewed the laptop computer on site. Like the items associated with plaintiff at the residence, the laptop in his vehicle was devoid of any child pornography. (Doc. Nos 33-1, 33-7, 33-8, 34,35, 64 through 66).[7]

The time period that plaintiff was denied access to his vehicle and laptop according to plaintiff's complaint was approximately two-and-one-half hours.[8]

---

[7] During his examination of the laptop computer, Smith found evidence of a proxy server used by plaintiff that ultimately lead to nothing. (Doc. Nos. 33-1, 33-7, and 33-8). When asked by Smith about the Macintosh files found on one of items associated with plaintiff at the residence, plaintiff in Smith's words "was very evasive in his answer and first denied the Mac and then would not inform law enforcement of the current location of his Macintosh computer." (Doc. No. 33-1).

[8] Plaintiff states in his complaint that it took about two hours for officers to obtain the search warrant for his vehicle and laptop computer and another twenty minutes or so for SA Smith to conduct the onsite search of his laptop after it was seized from his vehicle. Defendants affidavits and the police reports are not specific enough to calculate the time period.

### 4. Followup contacts

Defendants later sought out Brian, the former subtenant of the Garcias whose illegal download of inappropriate material had prompted the warning letter from Midco. When asked what, if anything, he had done to warrant a "warning letter" from Midco, Brian admitted to defendants that he had used the P2P filing sharing software installed on his computer to download motions pictures. With Brian's permission, defendants searched both his residence and his computer. When forensically previewing the computer, Smith found P2P file sharing software along with the motion pictures Brian had admitted to downloading. He did not find any child pornography. (Doc. Nos. 33-1 & 33-6).

Also, in the days following law enforcement's search of the residence, Marybelle Garcia contacted Goodman to inquire about the status of the investigation and whether he had spoken with either plaintiff or the former subtenant to whom the "warning" letter had been directed. Goodman responded that law enforcement officers had spoken with both of them. He further advised that officers had been unable to locate the device from which SA Smith had downloaded the illicit images. (Doc. No. 34).

### C. Plaintiff's initiation and dismissal of a state court action

In the summer of 2014, plaintiff initiated an action in state district court against officers Smith, Goodman and Thomas as well as other members of law enforcement who assisted in the investigation and were present when the search of the residence was conducted. When he initiated the action, he requested leave to proceed under the pseudonym "Jose Doe" on the grounds that he could be exposed to future stigma because of the subject matter of the underlying investigation and that he should not be required to proceed under his real name. The state district court denied his

request, reasoning:

> A vague and generalized fear of public stigma is insufficient reason to close otherwise public proceedings, or allow proceedings under a pseudonym. Court proceedings are replete with public stigma. A party may proceed to divorce by allegations of adultery, abuse, alcoholism, abandonment, and a host of other very personal wrongs. Public stigma attached to these wrongs does not allow a party to proceed under an assumed name. A party may be sued for non-payment of rents, debts, or child support. The stigma of a deadline debtor, or a deadbeat dad does not provide reason to shelter the defendant's identity from the public. A patient may sue her doctor for malpractice, opening her entire medical record for public scrutiny. These highly personal disclosures could be embarrassing. They still do not provide the plaintiff with a cause to proceed under an assumed name.

(Doc. No. 33-12). Plaintiff subsequently elected to voluntarily dismiss his state court action. (Doc. No. 33-13).

### D.  Plaintiff's complaint in this case

In relevant part, plaintiff alleges the following in his complaint:

1.  This action arises out from the Minot Police Department, the Chief of Police, and his subordinates, and Federal agents, ("collectively Defendants") that in consequence intentionally and negligently violated the constitutional and state rights of this Plaintiff, among others, Jose Doe, for their own and public reasons. The context for these actions of overzealous investigations was the government's and local police's official investigation into computer child porn.

2.  To reach their goals, without allowing the protections of criminal justice, the Minot Police Department, his subordinates and Federal agents ("hereinafter Defendants'") intentionally and negligently stomped on Plaintiff Jose Doe's (herein "Plaintiff" Doe) constitutional and state rights and their own rules. By using a facially valid general search warrant served at Plaintiff's residence, that I am a renter of a room in a basement from a single family home. Plaintiff had a reasonable expectation of privacy from the separate room rental of a door with a lock and key. Therefore, Defendants' conducted an illegal search and seizure of Plaintiff's room without a particular search warrant, additionally Plaintiff was not available for the illegal search. Nonetheless, all of the other residents and renters were available for the facial search warrant. Most importantly, Defendants' did not turn up any evidence of computer child porn crime.

3.  To continue in their campaigning goal, Defendants' without an evidence or facts for proper justification, they continued by arriving to Plaintiff's place of employment because that is where I was at the time. At first, Defendants' investigation was at the residence and Plaintiff's rental room, which was somewhat private. Then, Defendants' continued, with gross reckless misconduct and without evidence, of their investigation right after the residential residence of Plaintiff's place to the public place of employment (medical facility) across the city and notifying my

employer. Further, Defendants' continued Plaintiff's investigation publicly at employer's open public parking lot with a patrol vehicle blocking Plaintiff's personal vehicle in detention, for all the community to see. No official booking arrest resulted, nevertheless, the unlawful detention. They artfully damaged Plaintiff Doe's employment at said employer by their defamatory information of investigation of computer child porn without valid particular probable cause. Defendants' damaging effected Doe's ability to earn a living by way of depriving of liberty and property without due process of law in violation of the Fifth Amendment to the U.S. Constitution. Defendants' have a responsibility to uphold the U.S. Constitution and laws of the U.S.

4.      Defendants' again, continued their campaign by contacting and notifying Plaintiff's landlord, Jose Garcia, at 212 18th St. N.W. Minot, ND, to inform him of the request to show a search warrant. When Plaintiff returned to the above referenced residence at the end of the day, Landlord Garcia was contacted and conveyed that the police are looking for the download of child porn and do not what the request for the search warrant was for. But to leave after the end of the month, because he (Garcia) does not want to rent the room to Plaintiff. Defendants' caused a wrongful eviction of Plaintiff causing to be homeless. Doe suffered damage in North Dakota to his reputation by defamation, emotional well-being, and his relationship with employer which resulted in termination and wrongful eviction, from Defendants' outrageous investigation, violating privacy, and departed from standard procedure of law enforcement and policies.

5.      Defendant Federal Special Agent Jessie Smith, North Dakota Bureau of Criminal Investigation, was at all relevant times concerning offending actions described in this Complaint, the Special Agent that applied for the General Warrant for the Investigation, acting under color of law. This defendant is sued in his official and individual capacity for damages, injunctive, and declaratory relief.

* * *

7.      On May 6, 2014, Plaintiff interrupted by police at his employment of the nursing home facility in Minot, ND.

8.      On May 6, 2014, Plaintiff was interrupted from work and told by managers at the nursing facility to arrive at a conference room. At the conference room, Plaintiff was informed to go to a conference room and Minot Officers and Special Agent detectives were awaiting to speak and question. This notified Plaintiff's employer at the nursing home of the criminal investigation ensuing and placing Plaintiff in a bad light.

9.      Detective Goodman informed this Plaintiff Doe that an investigation for computer child porn was being conducted. Next, Det. Goodman relayed that earlier the residence of Jose Garcia, at 212 18th St., N.W. Minot, ND, which included Plaintiff's room rental was seized and searched. Further, Det. Goodman stated in continuing to search and seizure of Plaintiff's computer and property for criminal child porn. Plaintiff was detained at a point beyond any reasonable understanding

of the immediate vicinity, that is the residence at 212 18th St. N.W. Minot.

10.     Then, Det. Goodman stated that may Plaintiff may request a search warrant for the search and seizure. Though, Defendant Goodman had no evidence or facts to <u>directly</u> link Plaintiff to computer child porn.

11.     Therefrom, Plaintiff had trouble understanding the ramifications of circumstances. However, Plaintiff requested a search warrant for my computer. Any denied to speak or communicate with the Detective's Goodman and other officers. Goodman conveyed that he may be able to obtain a search warrant and return.

12.     Plaintiff was returned to work very distracted. All the while, a uniformed Patrol Officer in a Minot patrol vehicle in the middle of the employer's parking lot, blocked and detained Plaintiff's personal vehicle. And a couple of hours later was contacted to return to the conference room and Det. Goodman and other officers presented Plaintiff with a search warrant . . . . Again, inflicting tortious interference with at all employment at Plaintiff's employment in nursing home with privacy violations and defamation. And, again, Plaintiff was detained beyond the immediate vicinity of the residence from the initial unreasonable general search warrant. The facially valid search warrant . . . continued and commenced the Defendant Detectives intrusion to seize and search Plaintiff's property and computer in the public plain view of employer's parking lot with onlookers. The facial search warrant lacked probable cause, evidence, and facts linking Plaintiff with computer child porn. There was no nexus to connect Plaintiff with downloading, no subscription, or dissemination of computer child porn by the facial warrant and/or false statements indicating thereof.

    The concept of probable cause–a familiar but fluid standard for a court to apply:

    the court confronts them: 1) as to subscribers of child pornography sites, the amount of information needed in order to conclude that there is probable cause to search the subscriber's computer and 2) as to distributors or recipients of child pornography, establishing the location of the computer used to distribute ore receive the materials.

    Without any indication that any of these individuals downloaded or uploaded or transmitted or received any image of child pornography, without any evidence that these individuals did anything more than simply subscribe, the Government argues that it had the right to enter their homes to conduct a search and seizure of their computers, computer files and equipment, scanners, and digital cameras. This cannot be what the Fourth Amendment contemplated.

    Here the intrusion is potentially enormous.

13.     Defendants' Thompson proceeded to search Plaintiff's vehicle, meanwhile Special Agent Jesse Smith (SA Smith) seized and searched the computer. After about approximately 20 minutes, SA Smith informed Det. Goodman that there were NO CHILD PORN on Plaintiff's computer. There was no charging arrest. Still Plaintiff was detained without any links to crime porn. Defendants' continued to question, interrogate and harass Plaintiff about computer porn. Plaintiff did not want to be

questioned and responded with no and no's. Defendants' discretionary function exceeded legal bounds and was grossly negligent by misconduct.

14. Finally, Defendants' released Plaintiff and had to clean and arrange the vehicle to be able to leave.

15. Plaintiff eventually arrived at his rental room residence at 212 18th St. N.W. Minot. Plaintiff's property was scattered all over the room and property was damaged from the illegal General Search Warrant conducted by Minot Police in the morning at approximately 9 AM. Luggage, bags, and locks broken and damaged from the separate room rental of a door with a lock and key. This search and seizure was conducted prior to Plaintiff's request for a specific search warrant and seizure at Plaintiff's employer.

16. There upon, landlord renter Jose Garcia conveyed to Plaintiff that the police contacted and notified him that I did not want to be searched and Garcia stated, he did not know where the download of computer porn came from. Plaintiff was asserting his constitutionally protected rights.

17. Consequently, Garcia delayed in release Plaintiff from the lease of the room rental and not renewing it at the end of the month, to leave. Furthermore, Plaintiff was terminated from employment the next day. In direct violation of the Privacy Act and regulations governing what law enforcement my [sic] publicly disclose regarding ongoing investigations. Here, the Defendants' intentionally, willfully and negligently disclosed records kept by the agencies pertaining to Plaintiff Doe in a false implication. Thus, resulted in Plaintiff being homeless and looking for affordable housing without employment and looking for suitable employment for many weeks.

18. Through Defendants' intentional, gross and reckless negligence, and misconduct acts resulting in defamation, tortious interference of at-will employment, harassment, inter alia, have violated Plaintiff Doe's clearly established constitutional rights.

19. Plaintiff rights as set forth above and other rights that will be proven at trial were violated by Defendants' intentional, willful, and negligent of the unauthorized disclosures of records pertaining to Plaintiff had and having an adverse effect on Plaintiff. Plaintiff suffered grave general and special damages and economic and non-economic damages in employment, wrongful eviction, and caused extreme mental and emotional distress.

(Doc. No. 9) (errors in original and emphasis in bold and underlined eliminated).

## II.  TREATMENT OF DEFENDANTS' DISPOSITIVE MOTIONS

As noted earlier, plaintiff has not materially disputed the factual material submitted in support of the Minot defendants' motion to dismiss or, in the alternative, for summary judgment, and SA Smith's joinder in that motion.  Consequently, the court should treat the defendants' dispositive motions ones for summary judgment.

The rules governing motions for summary judgment are well known to the court.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a).  Consequently, an extended discussion of the principles and nuances of the application of Rule 56 need not be repeated here.

## III.  PLAINTIFF'S FOURTH AMENDMENT CLAIMS

### A.  The claims relating to the search of the residence

#### 1.  The contention that probable cause was lacking for the search of the residence

Plaintiff makes two arguments for why defendants lacked probable cause to search the residence where he was residing.  Before turning to these arguments, it is helpful first to consider the applicable law as well as what SA Smith presented to the state judge in support of the request for the search warrant.

To be valid under the Fourth Amendment, a search warrant must (1) be based on probable cause, (2) be supported by oath or affirmation, (3) describe with particularity the place to be searched, and (4) describe with particularity the things to be seized.  Groh v. Ramirez, 540 U.S. 551, 557 (2004).  "Probable cause supporting the search warrant exist[s] if the affidavit set forth facts sufficient to create a fair probability that evidence of criminal activity would be found on the premises."  United States v. Gamboa, 439 F.3d 796, 805 (8th Cir. 2006).  "Whether probable cause

exist[s] depends upon the totality of the circumstances." Id. Further, the issuing judge's probable cause determination is entitled to "considerable deference." Id; see also United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)). Because of this, plaintiff's burden of demonstrating lack of probable cause is a heavy one. Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991) ("A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden.").

In this case, Smith attested in an affidavit that: (1) he is a certified computer forensic examiner well-versed in the means and methods by which persons use computers to exchange or transfer digital files over the Internet; (2) P2P file sharing networks and software are frequently used to distribute digital files containing child pornography over the Internet; (3) individuals with an interest in child pornography typically keep physical and/or digital copies of their collection in their home; (4) a computer with the subject IP address was identified as a potential source for at least one file of investigative interest; (5) on March 30, 2014, he downloaded 160 files from the computer with the subject IP address; (6) the files he downloaded contained images of females estimated to be between 8 and 14 years of age exposing their breasts, anus, and vaginas in various settings; and (7) the subject IP address was assigned to the Garcia residence. Based upon this information, the state district court judge reasonably concluded there was evidence of criminal activity at the residence. Among other possible offenses, N.D.C.C. § 12.1-27.2-04.1 provides that "[a] person is guilty of a class C felony if, knowing of its character and content, that person knowingly possesses any motion picture, photograph, or other visual representation that includes sexual conduct by a minor." Section 12.2-27.2-01 defines "sexual conduct" to mean, in relevant part, "lewd exhibition of the buttocks, breasts, or genitals . . . ." N.D.C.C. § 12.1-27.2-01.

The first argument that plaintiff makes for why probable cause for a search of the residence

was lacking is that the images downloaded by Smith were not demonstrated to be illegal as one could conceivably view them as works of erotic art as opposed to child pornography. This objection is specious. Taken as a whole, the affidavit reasonably establishes that the files in question contained child pornography based on affidavit's description of the contents of the files, SA Smith's characterization of the contents as being child pornography, and the manner in which the files were maintained and distributed, *i.e.*, a method of storage and dissemination that is commonly used by those trafficking in child pornography.

The second argument that plaintiff makes is that the mere association of the subject IP address to the residence was insufficient to establish probable cause to believe that there would be any evidence of criminal activity at the residence. This contention is also without merit. Particularly instructive is the Fifth Circuit's decision in <u>United States v. Perez</u>, 484 F.3d 735 (5th Cir. 2007). There, FBI agents investigated a third-party's receipt of an unsolicited Internet message containing child pornography. From information subpoenaed from an Internet service provider and others, they determined that the child pornography had been transmitted from an IP address assigned to defendant at his residence in Texas. Based on this information, a magistrate judge issued a warrant authorizing a search of the defendant's residence. When executing the warrant they discovered that the defendant's residence had multiple occupancy units.

On appeal, the defendant in <u>Perez</u> asserted that there was not probable cause for the search. The Fifth Circuit concluded otherwise, opining that there was probable cause to believe evidence of child pornography would be found at a physical address when based on the evidence that it had been transmitted from an IP address assigned to that physical address. Because of what the Fifth Circuit had to say about this subject and the defendants' contention that the warrant was lacking in

particularity due to the residence having multiple occupancy units - an argument that plaintiff also makes here as will be discussed next, the court's discussion about these two subjects is set forth in detail as follows:

> [T]hough it was possible that the transmissions originated outside of the residence to which the IP address was assigned, it remained likely that the source of the transmissions was inside that residence. See United States v. Grant, 218 F.3d 72, 73 (1st Cir. 2000) (stating that "even discounting for the possibility that an individual other than [defendant] may have been using his account, there was a fair probability that [defendant] was the user and that evidence of the user's illegal activities would be found in [defendant's] home") (emphasis in original). "[P]robable cause does not require proof beyond a reasonable doubt." Brown, 941 F.2d at 1302.

> Perez also argues that evidence that illicit transmissions were made does not give rise to probable cause that physical evidence would be located at the residence. However, [the third party] stated that the images she observed appeared to be videos played on a television screen transmitted via a web cam. There was therefore a basis to believe that the suspect would have such videos in his residence. Moreover, [the agent] stated in his affidavit that, in his experience, persons interested in child pornography typically retain numerous images of child pornography as well as "material documenting the arrangements, the introduction, and tasks to consummate the acquisition of child pornography." Based on this information, there was probable cause to believe that physical evidence of violations of the child pornography laws would be located at 7608 Scenic Brook Drive [the residence to which the IP address was assigned].

> The analysis is complicated, however, by the fact that 7608 Scenic Brook Drive has more than one occupancy unit. The Fourth Amendment requires that a warrant "particularly describe[e] the place to be searched and the persons or things to be seized." Multiple circuit courts have held that to satisfy the particularity requirement when a search involves a building with multiple, separate residency units, the warrant must specify the precise unit that is the subject of the search. See United States v. White, 416 F.3d 634, 637 (7th Cir. 2005). "[W]hen a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit." United States v. Butler, 71 F.3d 243, 249 (7th Cir. 1995); see also United States v. Hinton, 219 F.2d 324, 325–26 (7th Cir. 1955) ("For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses. Probable cause must be shown for searching each house or, in this case, each apartment."). Thus the general rule is that a warrant that authorizes the search of an undisclosed multi-unit dwelling is invalid. United States v. Gilman, 684 F.2d 616, 618 (9th Cir. 1982).

> There are, of course, exceptions to this rule. The warrant of a multi-unit structure will be valid where (1) there is probable cause to search each unit; (2) the targets of the investigation have access to the entire structure; or (3) the officers reasonably believed that the premises had only a single unit. United States v. Johnson, 26 F.3d 669, 694 (7th Cir.1994); Garrison, 480 U.S. at 85–86, 107 S.Ct. 1013. Gilman, 684 F.2d at 618. In assessing whether any of these exceptions can support the validity of the warrant, we must look to the information in

possession of the police and magistrate at the time the warrant was issued.  <u>Garrison</u>, 480 U.S. at 85, 107 S.Ct. 1013 ("The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and disclose, to the issuing Magistrate.").

* * * *

The officers performed a public records check, a utilities company check, and an internet white pages check, all indicating that 7608 Scenic Brook Drive was occupied by Perez and none indicating the presence of any other residents. We therefore conclude that the police officers reasonably believed that 7608 Scenic Brook Drive had only one resident at the time the warrant was issued. Accordingly, the warrant in this case was valid.

<u>Perez</u>, 484 F.3d at 740-42.

In this case, there is no dispute that SA Smith downloaded illicit images from an IP address assigned to the residence.  Given these facts, the state court judge reasonably concluded that such images could be found at the residence for the reasons stated in <u>Perez</u>.

### 2. Plaintiff's lack-of-particularity and scope objections with respect to the search of the bedroom he was occupying

Plaintiff also claims that probable cause was lacking for the search of the bedroom he was subletting based on the fact that the subject IP address was in Jose Garcia's name only.  He also claims that the search warrant was deficient because there was no particularized showing that child pornography was likely to be found in his room separate from whatever might be the case for the rest of the residence.  Implicit in these arguments is that defendants should have halted their search when they discovered that persons were subletting portions of the residence, rebooted their investigation, and obtained a new warrant based upon a more particularized showing of probable cause before they proceeded with a search of the room he was occupying.

In support of these arguments, plaintiff cites to the line of cases discussed in the excerpt from <u>Perez</u> above which makes clear that  a particularized showing of probable cause is required to search an individual residence in a multi-residential structure like an apartment building.   The problem

with this is that the circumstances in this case are materially different from those cases.

Although plaintiff contends the residence here was something akin to an apartment complex, everything in the record evinces that it was a typical single-family home and that SA Smith reasonably held this belief when he sought the warrant. The residence had a single mailing address and a common entrance, was devoid of any overt markings on its exterior and interior indicative of a multi-unit dwelling, and was zoned as a single family home. Plaintiff has not disputed this description of the residence in any material way. Nor has plaintiff materially disputed (1) the fact that any occupant of the residence could wirelessly connect their electronic devices to the Internet via Jose Garcia's Midco account and (2) because any electronic device so connected would appear to the outside world to have the subject IP address, it was technically impossible for someone in SA Smith's position to pinpoint the exact device which had transmitted the illicit images let alone where this device was located in the residence when the transmission occurred, which could have been anywhere.[9]

---

[9] In his affidavit, SA Smith states:

5.     When I requested the search warrant, I did not know who was downloading and sharing illicit images and videos. I knew that an electronic device utilizing IP address 24.220.174.12, which was assigned to Jose Garcia at 212 18th Street NW in Minot, was utilizing peer to peer software to obtain and distribute illicit materials. I did not know what type of or whose electronic device was utilizing that IP address.

6.     Based on my training and experience, I knew that IP address 24.220.174.12 was an outside or public IP address. I knew that routers assign an internal IP address, which allows multiple electronic devices to utilize the same outside or public IP address. Depending on the routers and types of services running it, 50 to 254 internal IP addresses, and sometimes even more can be assigned to one outside or public IP address. This meant that each electronic device connected through the router, wireless or through a LAN line, would display the same outside or public IP address; but each would have been assigned a unique internal IP address. The technology made it impossible for me to narrow the search down to a specific user or location within the house because all I can see is the outside or public IP address.

7.     All of the residents of 212 18th Street NW shared the same internet service, with the outside or public IP address of 24.220.174.12. This is the IP address which was seen online using peer to peer networks participating in the file sharing of suspected child pornography. With all residents utilizing

As the Fifth Circuit explained in <u>Perez</u>, there are the exceptions to the particularity requirements for warrants for buildings with multiple residency units "where (1) there is probable cause to search each unit; (2) the targets of the investigation have access to the entire structure; or (3) the officers reasonably believed that the premises had only a single unit." <u>Perez</u>, 484 F.3d at 741 In <u>Perez</u>, the Fifth Circuit concluded that the search warrant for what turned out in that case to be a multi-occupant residence was valid because of the reasonableness of law enforcement's belief at time of the search warrant's issuance that the residence had only one occupant. <u>Id.</u> at 742. The same rationale applies in this case.

Also, another case with facts very similar to this one is <u>United States v. McLellan</u>, 792 F.3d 200 (1st Cir. 2015), where the First Circuit concluded that FBI agents had acted well within the scope of their authority when searching an entire residence for child pornography. There, FBI agents executed a search warrant for a residence belonging to an individual from whose IP address they had downloaded files containing child pornography. The defendant in that case, McLellan, was

---

the same IP address, it is reasonable to believe that any of the residents of the house could be accessing illicit files. Because of this and the other information I had, as explained in the warrant application, I believed there was evidence to search the entire premises of 212 18th Street NW.

* * *

9.     Law enforcement located several individuals at 212 18th Street NW when they executed the Search Warrant on May 5, 2014. These individuals stated they rent room in this house. When I went through the house, there was no indications of separate units, such as apartment number or letters. Inside the residence, law enforcement located items of numerous individuals. The items contained the 212 18th Street NW mailing address with no apartment number listed. It was discovered through interviews that individuals were "illegally" renting rooms in the residence as the city had not permitted the residence as a multi-family dwelling. During the interviews and search of the residence the occupants identified which rooms belonged to each person.

10.     Jose Doe's room (I am using a pseudonym) was not locked at the time of the execution of the Search Warrant. Another occupant shared the room with Jose Doe. The room was a single room with a sheet hanging in the middle that divided the room in half.

(Doc. No. 66).

renting a bedroom in the residence.   In it agents found numerous devices containing child

pornography.  McLellan moved unsuccessfully to suppress the admission of these devices and their

contents on the grounds that the search of his rented bedroom exceeded the warrant's permissible

scope.   As illustrated by the following excerpt of its decision, the First Circuit soundly rejected

McLellan's assertion on appeal that the multi-unit character of the residence rendered the search

warrant insufficiently particular and that agents should have suspended their search upon

discovering that rooms within the residence had been rented.

> Here, McLellan argues that [the residence] was a multi-unit dwelling, and thus the search of
> his room violated the Fourth Amendment's particularity requirement. This argument is in
> deep trouble before it even begins, however, because the district court made a factual
> determination that [the residence] was a single-family residence. Specifically, the district
> court found that McLellan's room "was not equipped for independent living" because there
> was no separate entrance to the street and the occupants had joint access to the common areas
> such as the kitchen and living rooms. Though McLellan disagrees with the court's ultimate
> conclusion as to a single-versus multi-family residence, he does not dispute this underlying
> description of his room and the premises. Accordingly, we are hard-pressed to disagree with
> the district court's factual finding that [the residence] is a single-family residence; and at the
> very least, the finding is in no way clearly erroneous. See Ferreras, 192 F.3d at 11 (holding
> that an attic was included in a search warrant for the building's second floor because it was
> connected to the second floor apartment, lacked an exit to the street, and was "not equipped
> for independent living"); United States v. Hinds, 856 F.2d 438, 441–42 (1st Cir. 1988)
> (finding a single-family building where there "were no indications, such as separate
> doorbells or mailboxes, that more than one family lived" in the building and "the top floor
> ... was not separated from the floors below by a door"). McLellan's reliance on cases such
> as Maryland v. Garrison, 480 U.S. 79, 107 S.Ct. 1013, 94 L. Ed.2d 72 (1987), and United
> States v. Vaughan, 875 F. Supp. 36 (D. Mass.1995)—all involving multi-unit
> residences—are therefore misplaced.
>
> Perhaps recognizing that this argument is a lost cause, McLellan also contends that even if
> the warrant was particular on its face, information learned during the execution of the
> warrant revealed a "factual mistake" regarding the premises which required the FBI to
> exclude McLellan's bedroom from its search. See Garrison, 480 U.S. at 87, 107 S.Ct. 1013
> ("[The officers] were required to discontinue the search of respondent's apartment as soon
> as they ... were put on notice of the risk that they might be in a unit erroneously included
> within the terms of the warrant."); Ricciardelli, 998 F.2d at 17 n. 10 (noting that when police
> executing a warrant discover a factual mistake, they " 'must reasonably limit their search
> accordingly'" (quoting Garrison, 480 U.S. at 89 n. 14, 107 S.Ct. 1013 )). We reject
> McLellan's contention that any "mistake" was made.
>
> Contrary to McLellan's contention, the additional information gathered by the FBI actually
> increased the likelihood that McLellan—and not one of the other occupants—was [the

source of the child pornography]. First, by talking to [the owner of the residence], the FBI learned that all three occupants shared [the owner's] internet account via a wireless router, and thus every internet connection established from any of the occupants' computers would trace back to the same IP address. See In re BitTorrent Adult Film Copyright Infringement Cases, 296 F.R.D. 80, 84 (E.D.N.Y. 2012) (explaining that "[i]f you use a router to share an Internet connection, the router gets the IP address issued directly from the ISP" and thus "[a]n IP address provides only the location at which one of any number of computer devices may be deployed, much like a telephone number can be used for any number of telephones" (internal quotation marks omitted)); Patrick Collins, Inc. v. Doe 1, 288 F.R.D. 233, 235 (E.D.N.Y. 2012) ("[A] single IP address may host one or more devices operated or owned by multiple users (for example, a computer or handheld tablet), each communicating on the same network, such as with a wireless router or a business intranet." (internal quotation mark omitted)). Second, [the owner] denied using Gigatribe or Yahoo!, and given his admission that he did (albeit accidentally) have child pornography on his computer, the FBI had reason to believe St. Yves's denial. Third, [the owner] described McLellan as the most computer savvy of the three occupants. And finally, perhaps most telling, [the owner] informed the FBI that McLellan moved into [the residence] around December 1, 2009—the same day that [an FBI agent] downloaded the file containing child pornography from . . . an IP address originating [at the residence]. We fail to see how this new information should have led the FBI to conclude that McLellan could not be [the source of the child pornography].

The motion to suppress, therefore, was properly denied.

McLellan, 792 F.3d at 212-214.

In terms of this case, McLellan is further support for the conclusion that plaintiff's lack-of-particularity and scope objections with respect to the search of the bedroom are without merit. Also, for the reasons expressed in McLellan, defendants were not required to halt their search and obtain a new warrant once they learned that a number of unrelated persons were occupying the residence.

Plaintiff argues, nevertheless, that the door on his bedroom was "protected by lock and key." The undisputed evidence, however, is that the room was unlocked when SA Smith conducted his search either because it was unlocked when the law enforcement officers arrived or it was opened shortly thereafter by one of the other occupants of the residence who was within the room. Further, even if the room was locked, that alone would not have been sufficient to vitiate the warrant given the fact that the device from which the illicit images were downloaded could have been located within the room.

### 3. The search of the containers located within the bedroom

It appears plaintiff is separately contending that something more was required before defendants could proceed with a search of his locked suitcase and duffel bag as well as the locked safe within the duffel bag. However, for the same reasons expressed above with respect to the search of bedroom, the warrant did not suffer from a lack of particularity in terms of the search of these containers, *i.e.*, the devices from which the illicit images were downloaded could have been located within the containers. In fact, electronic media were found in the containers as noted earlier, albeit without child pornography on them.

Moreover, as general matter, a warrant to search a premises extends to containers located on the premises in which the items that are the subject of the warrant might reasonably be found. See, e.g., United States v. Ross, 456 U.S. 798, 820-21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); United States v. Wright, 704 F.2d 420, 422-23 (8th Cir. 1983) (warrant for search of house for drugs extended to a locked safe since "the drugs could obviously fit within the safe and reasonably could be expected to be found in it," citing Ross); United States v. Morris, 647 F.2d 568, 572-73 (5th Cir. 1981) (warrant to search the home of an alleged bank robber extended to a locked jewelry box where cash was found and a second warrant was not required); United States v. Towne, 700 F.Supp.2d 125, 134 ("Any unlocked or locked container on the premises that could reasonably be conceal an item described in the warrant may be opened and searched.") (citing other cases addressing locked safes and briefcases).

### 4. Conclusion re search of the residence

In sum, defendants had proper authorization under the warrant issued by the state court judge to search the residence from top to bottom for evidence of child pornography, including plaintiff's suitcase, duffel bag, and safe, and defendants' activities at the residence were neither excessive in scope nor otherwise unreasonable in terms of the extent of the search.

### B. Plaintiff's claims relating to the detention and search of his vehicle and laptop

### 1. Plaintiff's contention that probable cause was lacking

Plaintiff next challenges the validity of the search warrant for his vehicle on the ground there was no probable cause to support its issuance. The record evinces otherwise.

SA Smith prepared a new affidavit in support of a search warrant for plaintiff's vehicle for any evidence of child pornography including the seizure for purposes of further search of any computer equipment located in vehicle. The new affidavit repeated essentially all of what was in the original affidavit submitted for the search of the residence and then included the following additional information:

On May 5, 2014, SA Smith obtained a search warrant for 212 18th St NW in Minot North Dakota from the honarbale [sic] Judge Mattson. On May 6th at about 9:30 am Law Enforcement executed the search at the residence. SA Smith previewed all the electronic devices and did not locate a device that contained any program related to the Bit Torrent network.

Detective Dave Goodman and Detective Krista Thompson with Minot Police Department interviewed the residents at that location. The residents stated that [Jose Doe] has resided at the residence since mid-march 2014. The residents stated that [Jose Doe] was on a computer nightly. They stated that [Jose Doe] had a blue bag that he always had with him when he was on the computer. Law enforcement did not locate this bag or computer. They also stated that [Jose Dose] currently works at Trinity as a CNA. They also stated that [Jose Doe] drives a Blue Hyundai.

Detective Goodman and Thompson and SA Smith went to Trinity Nursing home and located a 2008 Blue Hyundai Accent with North Carolina Plate AHF9950 which comes back to [Jose Doe]. SA Smith looked through the window of the car at Trinity Nursing Home and observed a blue sachel [sic] bag on the passenger seat which was partially unzipped. This matched the description of [Jose Doe's] computer that was given to Law Enforcement at the residence.

Law Enforcement attempted to interview [Jose Doe], who stated that he did not want to answer any questions. Law Enforcement concluded the interview with [Jose Doe]. Minot Police Department is currently observing and securing the 2008 Hyundai Accent at Trinity Nursing Home.

(Doc. No. 33-4).

Here, an extended discussion of plaintiff's argument of lack of probable cause is unnecessary since it is apparent from the foregoing that there was more than a sufficient basis for the state court judge to conclude it existed given that plaintiff did reside at the residence during the period in question, the search of the residence had failed to uncover the source of the illicit files that SA Smith had downloaded, the information provided by other residents that plaintiff was frequently on his computer at the residence as well as their description of plaintiff's laptop and computer bag, and the observation of the officers of the bag and laptop on the front seat of plaintiff's vehicle. Further, even if the question was close, which it is not, plaintiff has failed to overcome the heavy presumption favoring the warrant under the cases cited earlier.

### 2. The detention and search of his vehicle and laptop

Plaintiff also contends that defendants unlawfully detained both he and his vehicle for the time it took for defendants to seek the second warrant and complete the search.[10] Defendants are dismissive of plaintiff's suggestion that he was unlawfully detained and direct the court's attention to a concession made by plaintiff in his complaint that his movement was not restricted while he was waiting for defendants to return with the search warrant since he returned to work after their initial contact with him.

Construing the record most favorably for plaintiff, there is nothing to indicate he was personally detained in the sense he was prohibited from the leaving the area. Rather, he returned to work while officers sought and obtained the search warrant for his vehicle and there is nothing to suggest that, instead of returning to work, he could not have left the premises altogether, taking

---

[10] The tenor of plaintiff's complaint suggests that he was more concerned about the mere presence of law enforcement as opposed to the wait for them to obtain the search warrant.

a cab, for example.

That being said, plaintiff was temporarily deprived of the use of his vehicle and laptop and his freedom of movement was constrained to the degree he was not permitted to access either of these items for the time period it took to secure and execute the warrant. As noted earlier, this temporary deprivation of his property and partial restraint on his liberty lasted approximately two-and-one-half hours with no contention on the part of plaintiff (much less facts to suggest) that defendants were less than diligent in their pursuit and execution of the warrant.[11]

As to whether this temporary detention of plaintiff's property and restraint upon his liberty violated the Fourth Amendment, the United States Supreme Court's decision in <u>Illinois v. McArthur</u>, 531 U.S. 326 (2001) is dispositive. In <u>McArthur</u>, police obtained information that a homeowner had drugs in his residence. When police sought permission from the homeowner to conduct a search and were refused, the homeowner, who by that time was outside the residence on the porch, was prohibited from reentering his residence unless accompanied by an officer while other officers left to obtain a search warrant. While the precise time the homeowner was prohibited from reentering the residence unaccompanied cannot be determined from the facts, it appears to have been somewhere in the neighborhood of an hour-and-a-half. 531 U.S. at 328-29.

In addressing the issue of whether the homeowner's Fourth Amendment rights had been violated, the Supreme Court stated in <u>McArthur</u>: "Temporarily keeping a person from entering his home, a consequence whenever police stop a person on the street, is considerably less intrusive than

---

[11] The fact that it took the officers some two hours to obtain the warrant does not seem unreasonable given: (1) the time it took to prepare the new paperwork (even though much of the contents of the lengthy affidavit in support of the warrant was likely cut and pasted from the prior affidavit); (2) tracking down the judge and the judge reading the lengthy affidavit and issuing the warrant; and (3) the travel times (even if short) from the parking lot to where the paper work was prepared, from there to the judge's chambers, and from the judge's chambers back to the parking lot. Likewise, twenty minutes to conduct the search of the vehicle and the forensic search of the laptop on its face does not seem unreasonable.

police entry into the home itself in order to make a warrantless arrest or conduct a search." <u>Id.</u> at 336.  The Court then went on to conclude:

> In sum, the police officers in this case had probable cause to believe that a home contained contraband, which was evidence of a crime. They reasonably believed that the home's resident, if left free of any restraint, would destroy that evidence. And they imposed a restraint that was both limited and tailored reasonably to secure law enforcement needs while protecting privacy interests. In our view, the restraint met the Fourth Amendment's demands.

<u>Id.</u> at 337.

Relying upon <u>McArthur</u>, the Tenth Circuit concluded in <u>United States v. Cantu</u>, 405 F.3d 1173 (10th Cir. 2005) that a temporary detention resulting in an arguably greater deprivation of personal liberty than what took place here did not violate Fourth Amendment rights.  In that case, law enforcement officers had a storage facility under surveillance for suspected drug activity.  The defendant, who had prior arrests for possession of drugs including a previous arrest for possession at the storage facility, was observed dragging a large duffel bag from a tree line adjacent to the storage facility and placing the duffel bag into the trunk of a vehicle.  When defendant proceeded to exit the grounds of the storage facility in the vehicle, he was stopped a short distance later.  While the officers made no formal arrest, defendant and the other occupants of the vehicle were told that they were not free to leave (unlike in this case and in <u>McArthur</u>[12]) while officers sought, obtained, and executed a search warrant for the vehicle, a process that took about two-and-one-half hours.  405 F.3d at 1175-76.  The Tenth Circuit concluded this did not amount to a Fourth Amendment violation, stating in part:

> Having determined that the search warrant for Mr. Cantu's car issued on a showing of probable cause based on facts *in existence and known to police officers at the time Mr. Cantu was initially stopped*, it follows that the officers had probable cause to search the vehicle at the time of the initial detention. Without question, the officers could have immediately

---

[12]  There was no suggestion in <u>McArthur</u> that the homeowner was prohibited from leaving the area while officers obtained and executed the search warrant.

searched the vehicle under the automobile exception to the warrant requirement. See Florida v. Meyers, 466 U.S. 380, 381, 104 S.Ct. 1852, 80 L.Ed.2d 381 (1984) (per curiam) ("[P]olice officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant."); United States v. Oliver, 363 F.3d 1061, 1068 (10th Cir.2004). Instead, they chose to detain Mr. Cantu for a period of two-and-one-half hours while they obtained a search warrant. Mr. Cantu complains that this detention was unreasonable.

We believe the Supreme Court's decision in Illinois v. McArthur, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001), is dispositive here. In McArthur, police officers were informed by the wife of the defendant that he was in possession of drugs. Id. at 329, 121 S.Ct. 946. After the defendant refused consent to search his home, police officers detained him on the front porch for two hours while they obtained a search warrant. Id. Upon execution of the warrant, police officers discovered a small amount of marijuana and drug paraphernalia. Id. The defendant challenged his detention as unreasonable under the Fourth Amendment. A nearly unanimous Supreme Court rejected this argument, finding the detention reasonable for the following reasons: 1) police had probable cause to believe contraband was in the home; 2) police had good reason to fear that the defendant might destroy the evidence; 3) officers balanced law enforcement needs with the demands of personal privacy by neither searching the trailer nor arresting the defendant while obtaining the warrant; 4) the restraint was only imposed for a limited period of time, i.e., two hours. Id. at 331–32, 121 S.Ct. 946.

Reasons similar to those relied on by the Supreme Court attend this case. As we have previously determined, the police officers had probable cause to believe that Mr. Cantu's vehicle contained illegal narcotics. Moreover, given the inherent mobility of automobiles, the officers had every reason to believe that Mr. Cantu might flee with the drugs and destroy or conceal them were he not detained. We also believe the officers properly balanced law enforcement and private interests in this case. In contrast to an individual's expectation of privacy in his own home, a diminished expectation inheres with automobiles. See Colorado v. Bertine, 479 U.S. 367, 372, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); United States v. Arzaga, 9 F.3d 91, 94 (10th Cir.1993). By seeking a warrant, even when they might have proceeded to search the vehicle without one, the officers evidenced the utmost respect for Mr. Cantu's privacy. Finally, we do not believe the two-and-one-half hour detention in this case was unreasonable. Nothing in the record indicates that the officers failed to act diligently in pursuing and obtaining the warrant. See McArthur, 531 U.S. at 332, 121 S.Ct. 946. Accordingly, we hold that Mr. Cantu's detention was reasonable.

Id. at 1178-79.

While the Tenth Circuit decision in Cantu lends support, this court need look only to the Supreme Court's decision in McArthur to conclude there was no Fourth Amendment violation in the temporary detention of plaintiff's vehicle and laptop.

## C.    Damage to plaintiff's property

Plaintiff further contends that law enforcement officers damaged his property during the

search of his bedroom and otherwise left his bedroom and vehicle a mess

The only thing that the record reveals in terms of damage to plaintiff's property, however, is that SA Smith broke a zipper pull on both his suitcase and his duffel bag in order to gain access because the zippers were secured shut by padlocks.[13]  Under the circumstances, this does not give rise to a Fourth Amendment violation since what was done was reasonably necessary to complete the search.  See, e.g., Dalia v. United States, 441 U.S. 238, 258 (1979) ("officers executing search warrants on occasion must damage property in order to perform their duty"); Lykken v. Brady, 622 F.3d 925, 930 (8th Cir. 2010) (same citing Dalia);  Ginter v. Stallcup, 869 F.2d 384, 388 (8th Cir. 1989) (Fourth Amendment protects only against destruction of property that is not necessary to effectively execute the warrant).  As for plaintiff's contention that his personal effects were not put back in the manner in which he kept them leaving a mess, while this might reflect a lack of professionalism on the part of the officers conducting the search if true, it does not rise to the level of a Fourth Amendment violation.  See Lykken, 622 F.3 at 929-31(no Fourth Amendment violation as matter of law even though, when defendants finished searching, the home was left in a mess, the stove was filthy, one of the refrigerators was left unplugged, and holes dug on the property were not filled); Cook v. Gibbons, 308 Fed.Appx. 24, 31 (8th Cir. 2009) (unpublished).[14]

---

[13]  Smith also dislodged the locking mechanism to the safe with a screwdriver, but plaintiff has not presented any evidence that this resulted in any material damage to the safe.  But, even if it did, it would not give rise to a Fourth Amendment violation for the same reasons as the damage to the zipper on the two bags, i.e., the damage was reasonably necessary to carry out the search.

[14]  Plaintiff's complaint is not specific in terms of which federal constitutional rights he claims were violated and his brief mentions only the Fourth Amendment.  However, even if he was contending he suffered a deprivation of property  in violation of his due process rights, he would have no cognizable claim because he had an adequate post-deprivation remedy for damages under either N.D.C.C. ch 32-12.1 (claims against political subdivisions) or ch. 32-12.2 (claims against the State of North Dakota).  See Hudson v. Palmer, 468 U.S. 517, 533 (1984); El-Alamin v. Radke, 369 Fed. App'x 770, 771 (8th Cir. 2010) (dismissal of plaintiff's civil rights claim for damage to property during a search because an adequate post-deprivation remedy was available under state law, citing Hudson).   Also, while what is set forth above disposes of plaintiff's Fourth Amendment claims for damages, the availability of an adequate state post-deprivation remedy also appears to be a bar to his Fourth Amendment claim as well - at least in the Eighth Circuit.  See

### D.       Plaintiff's claim of defamatory investigation

Finally, plaintiff's complaint accuses defendants of conducting a "defamatory investigation." Plaintiff alleges that defendants communicated information about their investigation through their words and in their actions that placed him in a bad light, poisoned his landlord and employer against him, and ultimately cost him his job at the nursing home and his place to stay at the residence.

Defendants insist that plaintiff's defamation must be dismissed as a matter of law. They deny ever having told anyone that plaintiff had engaged in criminal activity. They further aver that the statements about the investigation plaintiff has attributed to them were true. Finally, they aver that these alleged statements were privileged.

Defamation is generally considered an issue of state and not of federal constitutional law as damage to reputation alone is not sufficient to invoke the protections of the Due Process Clause. See, e.g., Paul v. Davis, 424 U.S. 693, 702 (1976) (There is "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."); Mowbray v. Cameron County, Tex., 274 F.3d 269, 277 (5th Cir. 2001) (allegations of slander resulting in public humiliation, scorn, and ridicule, did not state a claim under 42 U.S.C. § 1983); Ellingburg v. Lucas, 518 F.2d 1196, 1197 (8th Cir. 1975) (per curiam) (defamation is not a constitutional violation); Torres v. McStravick, No. H–11–2657, 2011 WL 2960191, at *3 (S.D. Tex. July 21, 2011) ("[L]ibel and slander are not cognizable under 42 U.S.C. § 1983, because a defamation claim does not involve the deprivation of any rights, privileges or immunities which are secured by the Constitution or laws of the United

---

Ali v. Ramsdell, 423 F.3d 810, 814 (8th Cir. 2005) ("[A] majority of the [Supreme] Court in Hudson * * * held that a Fourth Amendment property claim against state officials is barred by the availability of an adequate remedy under state law."); Gilmore v. Dubuc, No. 13-1019, 2015 WL 3645846, at 2 (D. Minn. June 10, 2015).

States.").

At least one federal appellate court has held, however, that conduct of law enforcement officers that is specifically intended to cast a criminal suspect in bad light and for which there is no reasonable law enforcement purpose can in some instances violate the Fourth Amendment. <u>See</u>, <u>e.g.</u>, <u>Lauro v. Charles</u>, 219 F.3d 202, 211-13 (2d Cir. 2000) ("perp walk" for which there was no legitimate law enforcement purpose violated Fourth Amendment rights). In this case, however, there was a legitimate law enforcement purpose for defendants' actions in conducting the search of the residence, interviewing plaintiff at his place of work, and detaining plaintiff's vehicle and laptop; they were legitimately pursing their investigation as the state-court warrants demonstrate. The mere fact defendants' investigative efforts were conducted in the presence of plaintiff's landlord, employer, or fellow employees did not violate plaintiff's constitutional rights under the Fourth Amendment or otherwise. <u>Cf</u>, <u>e.g.</u>, <u>Caldarola v. Cnty. of Westchester</u>, 343 F.3d 570, 572, 575–77 (2d Cir. 2003) (unstaged perp walk did not violate the Fourth Amendment because there was a legitimate law enforcement justification); <u>Moore v. City of Grand Prairie</u>, No. 4:12–cv–624–A, 2013 WL 1174457, at *6 (N.D. Tex. March 21, 2013) (arrest in front of co-workers did not violate Fourth Amendment rights).

### E.     <u>Qualified immunity</u>

The defendants have asserted the defense of qualified immunity with respect to the claims being made against them in their individual capacity. While the ultimate conclusion here is that there were no Fourth Amendment violations, the state of the law with respect to the Fourth Amendment claims made by plaintiff was not so clearly established that a reasonable officer would have known that his or her conduct was unlawful under the particular circumstances as illustrated by the foregoing discussion. <u>See</u> <u>Atkinson v. City of Mountain View, Mo.</u>, 709 F.3d 1201, 1211

(8th Cir. 2013) (quoting <u>Rohrbough v. Hall</u>, 586 F.3d 582, 585 (8th Cir. 2009)) (alteration in original) (internal quotation marks omitted) (setting forth two-pronged inquiry for consideration of qualified immunity).  Hence, defendants are entitled to qualified immunity with respect to the damage claims being made against them in their individual capacities.

## IV.    **PLAINTIFF'S PRIVACY ACT CLAIM**

Plaintiff claims that defendants violated his rights under the Privacy Act of 1974, codified at 5 U.S.C. § 552(a), to the extent "they intentionally, willfully and negligently disclosed records kept by the agencies pertaining to Plaintiff Doe in a false implication."  (Doc. No. 9) (errors in original).

 "Although the protection afforded by the Privacy Act is broad, its civil remedy provision is far less expansive." <u>Dittman v. Cal.</u>, 191 F.3d 1020, 1026 (9th Cir. 1999).  Courts have generally held that the private right of action created by the Privacy Act is limited specifically to actions against agencies of the United States Government; the Act's civil remedy provisions do not apply against private individuals or entities, state agencies, or state and local officials.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Spurlock v. Ashley County</u>, 281 Fed. App'x 628, 629 (8th Cir. 2008) (plaintiff had no cause of action under the Privacy Act against a non-federal defendant); <u>Schmidt v. City of Detroit</u>, 395 F.3d 327, 329-31 (6th Cir. 2006) (the Privacy Act applies solely to federal agencies); <u>Pennyfeather v. Tessler</u>, 431 F.3d 54, 56 n.1 (2d Cir. 2005) (there is no private right of action against municipal or state officials under the Privacy Act).

Here, defendants are not employed by any federal agencies.  SA Smith is a State employee and Sgt. Goodman and  Det. Thompson are municipal employees.  Consequently, plaintiff has no private right of action against them under the Privacy Act.

## V.  STATE-LAW CLAIMS THAT PLAINTIFF MAY BE ASSERTING

It is unclear from plaintiff's complaint whether he is asserting any state-law claims for relief. In his complaint, he alleges defamation and tortious interference with at-will employment but then goes on to state that these acts violated his established constitutional rights.  At the beginning of his complaint, he does reference, however, a state constitutional provision and a state statute.

While the court does have supplemental jurisdiction over any state-law claims that plaintiff may be attempting to assert  under 28 U.S.C. § 1367(a), this jurisdiction is discretionary.  Under subsection (c),  a court may decline to exercise its supplemental jurisdiction when:

(1)     the claim raises a novel or complex issue of State law;
(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3)     the district court has dismissed all of its claims over which it has original jurisdiction, or
(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

In making the decision whether to exercise or decline supplemental jurisdiction "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 348-49 (1988).  And, "[w]hen a district court dismisses federal claims over which it has original jurisdiction, the balance of interests will usually point toward declining to exercise jurisdiction over the remaining state law claims."  Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC, 781 F.3d 1003, 1016–17 (8th Cir. 2015) (quotation omitted).

In this case, if the court dismisses the federal claims, the state courts are better positioned to resolve any state-law claims, including, for any defamation claim, resolving questions of what

might constitute defamation under the particular circumstances of the case, when it may be privileged, and any defenses of governmental immunity under state law that may apply and, for any violation of the State's constitution, whether its protections are broader than the federal constitution.

See Lykken v. Brady, No. Civ. 07–4020, 2009 WL 2244177, at *11 (D.S.D. July 27, 2009) (declining "to exercise supplemental jurisdiction over plaintiffs' state-law claims because these claims raise issues of state tort law and the state-law doctrine of official immunity that are best resolved by the state court"); see also Woods v. Arkansas Dept. of Corr., 329 Fed. App'x 688, 693 (8th Cir. 2009) (unpublished per curiam) (district court did not abuse is discretion in declining to exercise supplemental jurisdiction over plaintiff's state-law defamation claim after all the federal claims had been dismissed).

## VI.     MOTIONS TO DISMISS BASED ON USE OF A PSEUDONYM

SA Smith and the Minot defendants both argue that this case should be dismissed unless plaintiff proceeds with this action in his own name.  In response, plaintiff filed a motion requesting that he be permitted to proceed using a pseudonym.

Fed. R. Civ. P. 10(a) provides that a complaint shall state the names of all of the parties. "Pursuant to this rule, there is a 'strong presumption against allowing parties to use a pseudonym.'" Roe v. St. Louis Univ., No. 4:08CV1474, 2009 WL 910738, at *2 (E.D. Mo. April 2, 2009) (quoting W.G.A. v. Priority Pharm., Inc., 184 F.R.D. 616, 617 (E.D. Mo. 1999)); see also Doe v. Pittsylvania County, Va., 844 F.Supp.2d 724, (W.D. Va. 2012) (citing cases from the Fourth, Fifth, and Tenth Circuits for the proposition that parties are allowed to proceed anonymously only in the most exceptional of circumstances); Luckett v. Beaudet, 21 F.Supp.2d 1029 (D. Minn. 1998) ("When a party invokes the judicial powers of the United States, she invites public scrutiny of the dispute and the proceeding.").  "The reason for the presumption is a First Amendment interest in public

proceedings such as lawsuits, which is furthered by identifying the parties to an action." W.G.A. 184 F.R.D. at 617; see also Doe v. Del Rio, 241 F.R.D. 154, 156 (S.D.N.Y. 2006) ("Requiring a plaintiff to place his or her name on the complaint serves the constitutional goal of enabling public monitoring of the courts: The press and public can hardly make an independent assessment of the facts underlying court cases, or even assess judicial impartiality or bias, without knowing who the litigants are."). Nevertheless, this presumption is not an absolute and a court may, in its discretion, permit pseudonymous pleading in limited "matters of a sensitive and highly personal nature." Heather K. v. City of Mallard, Ia, 887 F.Supp. 1249 (N.D. Ia. 1995);see also James v. Jacobson, 6 F.3d 233, 238 (4th Cir. 1993); Doe v. Del Rio, 241 F.R.D. at 156.

When considering a request to use a pseudonym, courts generally employ a totality of-the-circumstances balancing to determine whether the plaintiff "has a substantial privacy right which outweighs the customary constitutionally-embedded presumption of openness in judicial proceedings." Roe v. St. Louis Univ., No. 4:08CV1474, 2009 WL 910738, at *2 (quoting Doe v Frank, 951 F.2d 320, 323 (11th Cir. 1992). In undertaking this balance, courts consider a myriad of factors, such as (1) whether plaintiff is suing the government or a private individual, (2) whether plaintiff is required to disclose information of the utmost intimacy, or (3) whether plaintiff risks criminal prosecution through the information contained in the pleading. See id.; see also Heather K. v. City of Mallard, Ia., 887 F.Supp. at 1255 (opining that the presence of one factor is not dispositive); see also Rose v. Beaumont Indep. School Dist., 240 F.R.D. 264, 266 (E.D. Tex. 2007) (considering other factors, such as the potential for violence, a party's age and related vulnerabilities, and prejudice to defendants).

In their respective motions to dismiss, defendants take the position that plaintiff's use of a pseudonym is not warranted under the present circumstances. In so doing they aver: (1) plaintiff's

real identity in the context of the investigation at issue has already been revealed in documents that are presently available to the public; (2) plaintiff has made no showing of specific harm that would result should he be required to proceed under his real name; (3) plaintiff's claims do not pertain to any highly sensitive matters peculiar to him; and (4) there is an overriding public interest in guaranteeing open access to the proceedings.

In response, plaintiff first asserts that he has already suffered concrete injuries–loss of housing and employment–as a consequence of defendants' actions. Second, stressing that matters of public records may be forever accessible/searchable in today's online world, he asserts that there is a real chance he could suffer additional stigma should he be required to proceed under his real name. Third, he analogizes his circumstances to victims of sex crimes who have been allowed by the courts to proceed anonymously when initiating civil proceedings. Finally, he asserts that defendants will suffer no prejudice should he be permitted to proceed under a pseudonym.

It is well settled that the potential for "some personal embarrassment or humiliation, standing alone, is insufficient to justify the use of a pseudonym." Rose, 240 F.R.D. at 267; see also Raiser v. Brigham Young Univ., 127 Fed. App'x 409 (10th Cir. 2005) (refusing to permit a plaintiff asserting claims of defamation and invasion of privacy to proceed anonymously); Doe v. F.B.I., 218 F.R.D. 256, 259 (D. Colo. 2003) ("A plaintiff claiming a privacy interest for the sake of his reputation does not create the 'unusual case.' Reputational interests alone are insufficient to outweigh the public's interest in an open court system that is subject to public scrutiny and criticism."). Also, defendants are correct that the "cat is already out of the bag" - at least to some extent. Id. at 260; see also Doe v. Del Rio, 241 F.R.D. at 157-58.

On the other hand, defendants were never able to prove that plaintiff ever possessed child pornography; plaintiff has pointed to concrete harm he claims he has already suffered and the

potential for future collateral harm is not insignificant; and there is no indication that mention of his name by the state district judge has resulted in his association with the investigation having been widely disseminated. Also, there is likely a greater stigma associated with the suggestion of possession of child pornography than many other suggestions of possible criminal conduct. For example, it is well known that even hardened criminals in our prisons take a dim view of crimes against children. Also, the moral opprobrium that may be placed on plaintiff arguably may be on par with that which might be suffered by a woman seeking an abortion. Finally, none of the cases cited by defendants exactly addressed the circumstances of this case.

Up to this point, this case has been litigated under the guise of plaintiff's pseudonym, including one interlocutory appeal to the Eighth Circuit. Given the particular circumstances of this case, there appears little to be gained by recaptioning the case now. For these reasons, it is recommended that the motions addressing this issue simply be deemed moot.

## VII.   RECOMMENDATION

For the reasons set forth above, it is **RECOMMENDED** as follows:

1.      The court grant the Motion to Dismiss or Alternatively for Summary Judgment by defendants Goodman and Thompson (Doc. Nos. 31 and 39) and the Motion for Judgment on the Pleadings by defendant Smith (Doc. No. 43) but only to the extent of **DISMISSING WITH PREJUDICE** plaintiff's federal constitutional and Privacy Act claims on the merits and also on grounds of qualified immunity to the extent that Goodman and Thompson are sued in their individual capacities.

2.      The court **DISMISS WITHOUT PREJUDICE** any state law claims that plaintiff may be asserting.

2.      The court **DEEM MOOT** defendant Smith's Motion to Dismiss based on the

grounds that plaintiff should not be permitted to proceed with a pseudonym (Doc.

No. 36) and plaintiff's Motion to Proceed with a Pseudonym (Doc. No. 49)

**<u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>**

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Failure to file appropriate objections may result in the recommended action being taken without

further notice or opportunity to respond.

Dated this 8th day of March, 2016.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court
